Ehmann v. Medflow, Inc., 2022 NCBC 55.

**STATE OF NORTH CAROLINA**

**MECKLENBURG COUNTY**

EUGENE K. EHMANN;
N. WILLIAM SCHIFFLI, JR.; and
THAD A. THRONEBURG,

       Plaintiffs,

    v.

MEDFLOW, INC., GREG E.
LINDBERG; ELI GLOBAL, LLC; ELI
RESEARCH, LLC; ELI EQUITY, LLC;
SNA CAPITAL, LLC; SOUTHLAND
NATIONAL HOLDINGS, LLC;
SOUTHLAND NATIONAL
INSURANCE CORPORATION;
DJRTC, LLC; AND MEDFLOW
HOLDINGS, LLC,

       Defendants.

**IN THE GENERAL COURT OF JUSTICE**
**SUPERIOR COURT DIVISION**
15 CVS 3098

**ORDER AND OPINION ON**
**DEFENDANTS' MOTION TO DISMISS**
**[Public]**[1]

1.     **THIS MATTER** is before the Court on Defendants' Motion to Dismiss (the "Motion") filed by Defendants Medflow, Inc., Greg E. Lindberg, Eli Global LLC, Eli Research LLC, Eli Equity LLC, SNA Capital, LLC, Southland National Holdings, LLC, Southland National Insurance Corporation,[2] DJRTC, LLC, and Medflow

---

[1] Recognizing that this Order and Opinion cites and discusses the subject matter of documents that the Court has allowed to remain under seal in this action, and out of an abundance of caution, the Court filed this Order and Opinion under seal on 12 September 2022 pending consultation with the parties regarding proposed redactions. (*See* ECF No. 434.) On 23 September 2022, the parties notified the Court that, after conferring, all parties agree there is no material in this Order and Opinion that requires sealing. Accordingly, the Court now files this public version of this Order and Opinion.

[2] Defendant Southland National Insurance Corporation separately filed a motion to dismiss the direct claims asserted against it ("SNIC's Motion"), (ECF No. 387), after filing the instant Motion and brief. SNIC's Motion is redundant and not properly before the Court. Accordingly, the Court declines to separately consider SNIC's Motion.

Holdings, LLC (collectively "Defendants"). (Defs.' Mot. Dismiss, ECF No. 120 ["Mot."].) The Motion requests the Court dismiss the Second Amended Complaint (the "Complaint") filed by Plaintiffs Eugene K. Ehmann, N. William Schiffli, Jr., and Thad A. Throneburg.[3]

2. For the reasons set forth herein, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the Motion.

> *Caudle and Spears, P.A., by Harold C. Spears and Christopher P. Raab, for Plaintiff*
>
> *Fox Rothschild LLP by Matthew N. Leerberg, Troy D. Shelton and Matthew W. Krueger-Andes, for Defendants*
>
> *Condon Tobin Sladek Thornton Nerenberg PLLC, by Aaron A. Tobin, pro hac vice, Kendal B. Reed, pro hac vice, and Jared T.S. Pace, pro hac vice, for Defendants*

Robinson, Judge.

## I. INTRODUCTION

3. Plaintiff Thad Throneburg ("Plaintiff") served as Chief Executive Officer of Defendant Medflow, Inc. ("Medflow") during which time Medflow was acquired by Defendant Greg E. Lindberg ("Lindberg") through various companies Lindberg directly or indirectly owned. Shortly after Medflow's acquisition, Plaintiff requested from Medflow certain payments which became due under Plaintiff's employment agreement. Medflow did not make such payments and instead placed Plaintiff on "paid vacation." This action followed.

---

[3] Subsequent to the filing of the Second Amended Complaint (ECF Nos. 118 and 119), Plaintiffs Eugene K. Ehmann and N. William Schiffli, Jr. dismissed their claims against Defendants, leaving Thad A. Throneburg as the sole remaining Plaintiff in this action.

4. The Complaint makes the following claims directly against all Defendants: Wage and Hour Act violation (count two); retaliatory employment discrimination (count three); tortious retaliation (count four); fraudulent transfer (count five); and unfair and deceptive trade practices (count seven). Against Medflow only, the Complaint directly alleges breach of contract (count one), fraud (count six), and replevin (count twelve). The Complaint's claim for successor liability (count eight) seeks to extend Medflow's liability to Medflow Holdings. Claims for alter ego (count nine) and civil conspiracy (count ten) seek to extend Medflow's liability to all other defendants. Count eleven requests a constructive trust remedy. (Second Am. Compl. ¶¶ 74–92.)

## II. FACTUAL BACKGROUND

5. The Court does not make findings of fact on a motion brought pursuant to Rule 12(b)(6) but instead recites only those facts included in the complaint relevant to the Court's determination of the motion.

### A. The Parties

6. Defendant Medflow is a North Carolina corporation providing electronic medical records software and related services specialized for the eye care industry. (Second Am. Compl. ¶¶ 27–28.)

7. Plaintiff is a North Carolina attorney and served as Medflow's CEO from 1 January 2005 to November 2007 when he sold his ownership interest in Medflow and returned to active law practice. (Second Am. Compl. ¶¶ 124–25.) Plaintiff was

rehired by Medflow as interim CEO on 10 December 2014. (Second Am. Compl. ¶ 127.)

8. Lindberg is a resident of Durham County, North Carolina and is the manager, president, or chairman of at least 101 entities who designate their principal offices as 2222 Sedwick Road, Durham, North Carolina. (Second Am. Compl. ¶ 17.)

9. Lindberg is the owner, directly or indirectly, of Defendants Eli Global, LLC ("Eli Global"), Eli Research, LLC ("Eli Research"), Eli Equity, LLC ("Eli Equity"), SNA Capital, LLC ("SNA"), Southland National Holdings, LLC, Southland National Insurance Corporation ("SNIC"), DJRTC, LLC ("DJRTC") and Medflow Holdings, LLC (collectively, with Medflow, the "Entity Defendants"). (Second Am. Compl. ¶¶ 40, 45, 49, 63, 67, 82, 85.)

10. Lindberg is also the owner, directly or indirectly, of nonparty Eli India, LLC ("Eli India"). (Second. Am. Compl. ¶¶ 87–89.)

**B.    The Employment Agreement**

11. Plaintiff was appointed interim CEO of Medflow for a 90-day period beginning on 10 December 2013. (Second Am. Compl. ¶ 137.) During that time, Plaintiff and Medflow leadership developed a three-year strategic plan for Medflow and decided that Plaintiff should stay on as Medflow's CEO should another suitable CEO not be found. (Second Am. Compl. ¶ 138.) Thereafter, Plaintiff executed a three-year written employment agreement with Medflow on or before 8 July 2014 (the "Employment Agreement"). (Second Am. Compl. ¶ 144.)

12. The Employment Agreement contains the following relevant provisions:

a. A three-year term as Medflow's CEO from 1 March 2014 until 28 February 2017;

b. An Annual Base Salary in the amount of $360,000 per year;

c. Upon the occurrence of a "Change of Control" of Medflow, Plaintiff becomes entitled to a Change of Control Payment equal to his Annual Base Salary "grossed up" by taxes and paid in a lump sum ("Change of Control Payment"); and

d. Severance benefits in the event Medflow terminates the Employment Agreement without cause or Plaintiff terminateshis Employment Agreement for "Good Reason" as defined in the Employment Agreement. Upon either occurrence, Plaintiff becomes entitled to his Annual Base Salary and insurance benefits for a period of 36 months which, in the event of a Change of Control are "grossed up" by taxes and paid in a lump sum ("Severance Benefits").

(Second Am. Compl. ¶ 164.) Medflow's obligations to Plaintiff under the Employment Agreement are secured by a security interest in certain of Medflow's assets including accounts software, general intangibles, and the proceeds of the foregoing (the "Encumbered Assets"). (Second Am. Compl. ¶ 165.)

## C.    Lindberg Acquires Medflow

13.    As of 31 August 2014, all issued and outstanding shares of Medflow were subject to the Amended and Restated Shareholders' Agreement dated August 31, 2005 ("Shareholders' Agreement").  (Second Am. Compl. ¶ 232.)

14.    The Shareholders' Agreement granted a right of first refusal to Medflow, and right of second refusal to other Medflow shareholders before any shareholder could sell Medflow shares to a third party.  (Second Am. Compl. ¶ 235.)

15.    As of 31 August 2014, Dominic James Riggi ("Riggi") was owner of 30% of all issued and outstanding shares of Medflow (the "Riggi Shares") and was a party to the Shareholders' Agreement.  (Second Am. Compl. ¶¶ 29–30, 233–34.)

16.    On 29 August 2014, Riggi formed DJRTC.  On 1 September 2014, Riggi transferred the Riggi Shares to DJRTC.  (Second Am. Compl. ¶ 242.)

17.    On 8 September 2014, Riggi and SNA entered an agreement under which SNA purchased DJRTC at a price of $2,704,620.53.  This transfer caused Lindberg to become the indirect owner of the Riggi Shares without Riggi having first offered such shares to Medflow and other Medflow Shareholders.  (Second Am. Compl. ¶ 242–43.)

18.    On 10 September 2014, DJRTC notified Medflow that SNA "now beneficially owns all of the [Riggi] Shares[,]" and that DJRTC wished to become a party to the Shareholders' Agreement.  (Second Am. Compl. ¶ 252.)

19.    Medflow determined that the transfer of the Riggi Shares to SNA was null and void due to its non-compliance with the Shareholders' Agreement.  (Second Am. Compl. ¶¶ 266, 269.)

20. SNA and DJRTC never cured their breach of the Shareholders' Agreement described in paragraph 17, *supra*. (Second Am. Compl. ¶ 268.)

21. At a Medflow shareholders meeting on 18 September 2014, Lindberg stated to Plaintiff that he would (i) leave Plaintiff in place as CEO, (ii) offer Plaintiff an employment contract, and (iii) give Plaintiff and other senior employees independence in operating Medflow. (Second Am. Compl. ¶ 658.)

22. Also on 18 September 2014, SNA made a tender offer directly to all non-Riggi shareholders to purchase their shares in Medflow. (Second Am. Compl. ¶ 260.)

23. Davlong Business Solutions, LLC ("Davlong") owned approximately 40% of all outstanding shares of Medflow (the "Davlong Shares") prior to 18 December 2014. Between 18 December 2014 and 16 January 2015, Eli Global and Davlong entered into a Stock Purchase Agreement whereby Davlong agreed to sell, and Eli Global agreed to buy, the Davlong Shares. (Second Am. Compl. ¶ 33.)

24. Eli Global transferred the Davlong Shares to DJRTC effective 16 January 2015. (Second Am. Compl. ¶ 34.)

25. Through exchanges of Medflow stock by DJRTC and Eli Global, "Change of Control" of Medflow as defined in the Employment Agreement occurred no later than 16 January 2015. (Second Am. Compl. ¶ 336.)

26. Because of Lindberg's ownership of SNA, Lindberg "owned, directly or indirectly, all or a controlling interest in all outstanding shares of Medflow" as of 16 January 2015. (Second Am. Compl. ¶ 37.)

**D. Plaintiff Requests Change of Control Payment**

27. Following Lindberg's acquisition of Medflow, on 16 January 2015, the Change of Control payment became due to Plaintiff. (Second Am. Compl. ¶¶ 164, 420–31, 609–22.)

28. Plaintiff requested the Change of Control payment on 22 January 2015, and Lindberg became aware of the content of the Employment Agreement on 23 January 2015 when they were provided to him by Eli Global employee Sandi White. (Second Am. Compl. ¶¶ 348, 356.)

29. When Plaintiff followed-up with Lindberg about the Change of Control payment, Lindberg informed Plaintiff that "we will review" the request for such payment. (Second Am. Compl. ¶¶ 366–67.)

30. On 27 January 2015, Lindberg's employee Vishal Kumar wrote to Lindberg, "[a]s you are aware, Sandi [White] is working to get new entity and its bank so that we can strip out [Medflow] assets, people (the ones we want to) and operations there . . . Hoping there are no more skeletons out there." (Second Am. Compl. ¶ 361.) Lindberg replied "[g]ood [o]n the movement of the assets to newco, we will time that carefully . . . please prepare for it then will give everyone heads up when timing is right." (Second Am. Compl. ¶ 362.)

31. On 8 February 2015, Lindberg sent an email to Plaintiff containing a proposed Termination Agreement in which he offered Plaintiff "at will" employment as CEO of Medflow Holdings at his current Annual Base Salary in exchange for termination of the Employment Agreement. (Second Am. Compl. ¶ 393.)

32. On 9 February 2015, Plaintiff replied to Lindberg that the proposed new employment agreement was much less favorable than his current Employment Agreement and requested payment of the Change of Control Payment by 16 February 2015. (Second Am. Compl. ¶ 403.)

33. Also on 9 February 2015, Plaintiff perfected his security interest in the Encumbered Assets by filing financing statements with the North Carolina Secretary of State. (Second Am. Compl. ¶ 492.)

34. On 10 February 2015, Lindberg held a meeting with Plaintiff at Medflow's Charlotte office and stated that he was concerned, among other things, with the inside dealing arising from the Employment Agreement. (Second Am. Compl. ¶ 409.) Lindberg then stated that Medflow was putting Plaintiff on "paid vacation" while Lindberg "sorted through" these concerns. (Second Am. Compl. ¶ 410.)

35. Plaintiff never received his Change of Control or Severance payments. (Second Am. Compl. ¶¶ 612–14.) Plaintiff then filed written complaints with the Wage and Hour Bureau of the North Carolina Department of Labor. (Second Am. Compl. ¶ 616.) The Commissioner of Labor issued to Plaintiff right-to-sue letters against Lindberg, Eli Global, Eli Research and Medflow. (Second Am. Compl. ¶¶ 628–35.)

**E.** **Transfer of Medflow's Assets**

36. Following Lindberg's acquisition of Medflow, software and intellectual property owned by Medflow was shared and used by developers for other companies

with Medflow receiving no, or inadequate, consideration for such use. (Second Am. Compl. ¶ 563.)

37. Between 5 March 2015 and 5 May 2015, Medflow transferred cash directly to Medflow Holdings in the total amount of $375,000 with Medflow receiving no, or inadequate, consideration. (Second Am. Compl. ¶ 504–05.)

38. On 12 March 2015, Medflow transferred $116,500 to Anderson Tobin, PLLC, which identified itself as counsel for Eli Global on 13 February 2015. (Second Am. Compl. ¶ 506.)

39. From 11 February 2015 to 18 March 2015, Medflow Holdings deposited in its bank account over $280,000 in accounts receivable owed to Medflow. (Second Am. Comp. ¶ 512.)

40. On 11 February 2015, Defendants caused a UCC financing statement to be filed with the North Carolina Secretary of State giving notice of a security interest granted to SNIC in all or substantially all of the assets of Medflow Holdings. (Second Am. Compl. ¶ 538.)

41. On or about 16 February 2015, all of Medflow's employees, except for Plaintiff, Ehmann, and Schiffli, were transferred to Medflow Holdings or terminated. (Second Am. Compl. ¶ 516.)

42. Eli India employee Satya Gottumukkala emailed Lindberg to confirm that Gottumukkala would leave Medflow's bank accounts in place; that all new transactions would be done through the Medflow Holdings bank account at Wells Fargo; and that all accounts receivable and accounts payable would be through the

Medflow Holdings account at Wells Fargo—to which Lindberg responded "[s]ounds good."  (Second Am. Compl. ¶ 519.)

### III.    PROCEDURAL BACKGROUND

43.    The Court sets forth here only those portions of the procedural history relevant to its determination of the Motion.  An extensive review of the procedural history of this case may be found at *Ehmann v. Medflow, Inc.*, 2020 NCBC LEXIS 46 at *12–20 (N.C. Super. Ct. Apr. 9, 2020).

44.    Plaintiff initiated this action on 18 February 2015 with the filing of its Complaint.  (ECF No. 1.)  This action was designated as a mandatory complex business case on 19 February 2015 and assigned to the Honorable Judge James L. Gale on 20 February 2015.  (ECF Nos. 4–5.)

45.    Plaintiff filed the Amended Complaint on 21 April 2015 (ECF No. 40) and the Second Amended Complaint on 2 December 2015 (ECF No. 118).

46.    Defendants filed the Motion pursuant to Rule 12(b)(6) on 4 December 2015. (ECF No. 120.)

47.    The Motion has been fully briefed.  (Defs.' Br. Supp. Defs.' Mot. Dismiss, ECF No. 121 ["Br. Supp."]; Pl.'s Br. Resp. Defs.' Mot. Dismiss, ECF No. 124 ["Br. Resp."]; and Defs.' Reply Br. Defs.' Mots. Dismiss, ECF No. 127 ["Reply Br."].)

48.     On 13 September 2016, Judge Gale issued an order denying the Motion "insofar as it attacks Plaintiffs' claims for breach of contract."  (Order Defs.' Mot. Dismiss 1, ECF No. 182 [13 Sept. 2016 Or."].)

49.     On 10 May 2021, this matter was reassigned from Judge Gale to the undersigned. (Reassignment Or., ECF No. 402.)

50.     On 16 September 2021, Plaintiffs Eugene K. Ehmann and N. William Schiffli, Jr. filed notices of voluntary dismissal with prejudice of all of their claims against the Defendants in this action. (*See* Not. Vol. Dismissal with Prejudice — Ehmann, ECF No. 406; Not. Vol. Dismissal with Prejudice — Schiffli, ECF No. 407.) Consequently, Throneburg is the only plaintiff remaining in this action.

51.     The remainder of the Motion is ripe for resolution.

## IV.  LEGAL STANDARD

52.     "On a Rule 12(b)(6) motion to dismiss, the question is whether, as a matter of law, the allegations of the complaint, treated as true, state a claim upon which relief can be granted." *Fischer Inv. Capital, Inc. v. Catawba Dev. Corp.*, 200 N.C. App. 644, 649 (2009). "[T]he complaint is to be liberally construed, and the trial court should not dismiss the complaint unless it appears beyond doubt that the plaintiff could prove no set of facts in support of his claim which would entitle him to relief." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 444 (2008).

53.     "[W]hen ruling on a Rule 12(b)(6) motion, a court may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001). Furthermore, a court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (quoting *Laster*

*v. Francis*, 199 N.C. App. 572, 577 (2009)). "The question before us is whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Gant v. NCNB Nat. Bank*, 94 N.C. App. 198, 199 (1989).

## V. ANALYSIS

54. Defendants move to dismiss all of Plaintiff's claims. As previously noted, Judge Gale's 13 September 2016 order denied Defendants' attempt to obtain dismissal of Plaintiff's claim for breach of contract. The Court therefore addresses each of the remaining claims.

### A. Piercing the Corporate Veil

55. Plaintiff seeks a judgment permitting him to pierce Medflow's corporate veil and obtain monetary relief from Lindberg, Eli Global, and other Defendants. (Second Am. Compl. ¶¶ 679–684.)

56. The general rule is that a corporation is distinct from its shareholders. *Ridgeway Brands Mfg., LLC*, 362 N.C. at 438. "[A] corporation's separate and independent existence is not to be disregarded lightly." *Dep't of Transp. v. Airlie Park, Inc.*, 156 N.C. App. 63, 68 (2003). In determining whether to pierce the corporate veil and hold a shareholder or director of a corporation personally liable to the corporation's creditors, North Carolina applies the "instrumentality rule." *See Acceptance Corp. v. Spencer*, 268 N.C. 1, 8 (1966).

57. Pursuant to the instrumentality rule, a plaintiff is required to prove three elements: first, complete domination by a third party over a company such that it has

no separate mind from the third party named as a defendant; second, that the domination has been used to commit a fraud or wrong against the plaintiff; and third, that the fraud or wrong caused injury or unjust loss to the plaintiff. *Glenn v. Wagner*, 313 N.C. 450, 455 (1985).

58.    Factors bearing on whether the three prongs of the instrumentality rule are satisfied include: inadequate capitalization, lack of compliance with corporate formalities, complete domination and control of the corporation such that it has no independent identity, and excessive fragmentation. *Estate of Hurst v. Moorehead I, LLC*, 228 N.C. App. 571, 578 (2013).  However, no single factor is determinative. "Rather, it is a combination of factors which . . . suggest that the corporate entity attacked had 'no separate mind, will or existence of its own' and was therefore the 'mere instrumentality or tool' of the dominant corporation." *Glenn v. Wagner*, 313 N.C. 450, 458 (1985).  Additional factors identified by North Carolina courts include: "non-payment of dividends, insolvency of the debtor corporation, siphoning of funds by the dominant shareholder, non-functioning of other officers or directors, [and] absence of corporate records." *Id.* at 458.

59.    Defendants raise three arguments for dismissal of Plaintiff's veil-piercing claim.  First, Defendants contend that "alter ego liability extends only to stockholders of a corporation[,]"   (Br. Supp. 6), a contention which our Supreme Court has expressly rejected. *Glenn v. Wagner*, 313 N.C. 450, 457–58 (1985) ("[A]lthough the instrumentality rule has, until now, been tailored to deal with 'dominion and control' as evidenced in a parent-subsidiary or sole dominant shareholder situation, the

[instrumentality] rule is not limited to factual situations or resulting legal analysis afforded by those cases.") The mere fact that the Entity Defendants are not shareholders of Medflow does not preclude application of the instrumentality rule — "[f]ocus is upon reality, not form." *Id.* at 458. Thus, when the facts warrant, the instrumentality rule may be used to extend liability to affiliated entities, as Plaintiff seeks to do here.

60.  Second, Defendants assert that Plaintiff's veil piercing claim merely recites the elements of the instrumentality rule and lacks sufficient facts to survive a motion to dismiss. (Br. Supp. 7–8.) "Mere recitations of the elements of a veil piercing claim and the factors alleged to show control, without supporting factual allegations, are 'bare legal conclusions' not entitled to any deference in considering a motion to dismiss." *Estate of Chambers v. Vision Two Hospitality Mgmt., LLC*, 2013 NCBC LEXIS 49, at \*12 (N.C. Super. Ct. Nov. 21, 2013).

61.  Plaintiff alleges that (i) "all of the [Entity D]efendants . . . are members of a single enterprise owned (directly or indirectly) and wholly dominated and controlled by Lindberg," (Second Am. Compl. ¶ 26); (ii) Lindberg turned over Medflow's financial system, computer network, and documentation to certain Entity Defendants and Nonparty Affiliates, (Second Am. Compl. ¶ 481); (iii) Lindberg caused Medflow to become undercapitalized by forming Medflow Holdings and "strip[ping] out assets, people . . . and operations [from Medflow][,] (Second Am. Compl. ¶¶ 360–62); and (iv) "Medflow's software and intellectual property is being co-mingled with software development and intellectual property of MDOffice, IOPracticeware,

ODOffice . . . with Medflow receiving no or inadequate consideration[.] (Second Am. Compl. ¶ 564.) These factual allegations permit an inference that Entity Defendants were "mere instrumentalit[ies] or tool[s]" of Lindberg which had "no separate mind, will or existence of their own." *Glenn*, 313 N.C. at 458.

62. Further, Plaintiff alleges that Lindberg used Entity Defendants to (1) prevent Plaintiff from obtaining the payments owed under the Employment Agreement, (Second Am. Compl. ¶ 679), and (2) transfer assets from Medflow to other Defendants and non-party entities to defraud Plaintiff from obtaining certain Medflow assets based on his security interest. (Second Am. Compl. ¶¶ 359, 646.)

63. Accordingly, the Complaint alleges sufficient facts that could show Lindberg's "complete domination" over the Entity Defendants and that Lindberg's domination "proximately caused [Plaintiff's] injury" by violating "[Plaintiff's] legal rights" under the Employment Agreement. *See Glenn*, 313 N.C. at 454–55.

64. Third, Defendants argue that "all equities weigh in favor of respecting the corporate Defendants' separate legal existences." (Br. Supp. 8.) Defendants base this argument on their contention that the Employment Agreement is "egregiously inequitable" and that Plaintiff should not receive the equitable benefit of veil piercing as a result. (Br. Supp. 8.) However, because Judge Gale's 13 September 2016 Order dismissed the Motion "insofar as it attacks Plaintiff['s] claims for breach of contract[,]" the Court declines to reconsider this argument concerning the Employment Agreement's validity. (*See* 13 Sept. 2016 Or. 1.)

65. Therefore, the Court denies the Motion to the extent it seeks dismissal of Plaintiff's veil piercing claim.

## B. Civil Conspiracy

66. Plaintiff seeks to hold all Defendants liable for each other's acts based on a theory of civil conspiracy. (Second Am. Compl. ¶¶ 685–688.) It is well-established that North Carolina law does not recognize an "independent cause of action for civil conspiracy." *Sellers v. Morton*, 191 N.C. App. 75, 83 (2008) (citation and quotation marks omitted); *see also Dove v. Harvey*, 168 N.C. App. 687, 690 (2005) ("The charge of conspiracy itself does nothing more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all." (citing *Shope v. Boyer*, 268 N.C. 401, 405 (1966))). Rather, "[o]nly where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement." *Sellers*, 191 N.C. App. at 83 (citation and quotation marks omitted).

67. Therefore, under North Carolina law, "a complaint sufficiently states a claim for civil conspiracy when it alleges (1) a conspiracy, (2) wrongful acts done by certain of the alleged conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *Krawiec v. Manly,* 370 N.C. 602, 614 (2018).

68. Defendants argue two grounds for dismissal of Plaintiff's conspiracy claim: first, that the intracorporate immunity doctrine bars the claim, (Br. Supp. 9), and second, that the Complaint fails to allege "that Defendants agreed to do anything,

much less a 'wrongful act.' " (Br. Supp. 10.) In response, Plaintiff submits three reasons that intracorporate immunity does not apply: (1) "the alleged conspiracy involved unrelated co-conspirators including James Riggi[,]" (Pl.'s Resp. 24), (2) North Carolina law does not extend the intracorporate immunity doctrine to commonly-owned affiliates, (Pl.'s Resp. 24), and (3) the "independent personal stake" exception enables the conspiracy claim to proceed (Pl.'s Resp. 24).

69. The intracorporate immunity doctrine holds that " 'there can be no conspiracy' between a corporation and its agents." *Vanfleet v. City of Hickory*, 2020 NCBC LEXIS 40, *15 (N.C. Super. Ct. March 30, 2020) (quoting *Chrysler Credit Corp. v. Rebhan*, 66 N.C. App. 255, 259 (1984). If, however, the alleged conspiracy involves parties outside of the corporate family, intracorporate immunity does not apply. *See State ex. Rel. Cooper v. McClure*, 2004 NCBC LEXIS 7, at **40–41 (N.C. Super. Ct. Dec. 14, 2004). Defendants argue that, because Plaintiff "go[es] to great lengths in the Complaint to show that the Defendants are affiliated entities commonly owned by Lindberg[,]" intracorporate immunity applies to the Defendants and "necessarily defeats [Plaintiff's] conspiracy claim and mandates dismissal." (Br. Supp. 9.)

70. As an initial matter, the Complaint does not sufficiently claim that Riggi, or any other non-affiliate, was a conspirator to breach Plaintiff's Employment Agreement and defraud Plaintiff of the benefits thereof — the underlying claim upon which Plaintiff's conspiracy claim is based. The Complaint alleges that Lindberg, SNA, and Eli Global conspired with Riggi in "August 2014 or early September 2014" to breach the Shareholders Agreement in order to acquire Medflow. (Second Am.

Compl. ¶ 237.) The Complaint further alleges that Lindberg, through entities in his control, successfully acquired Medflow "no later than January 16, 2015." (Second Am. Compl. ¶ 336.) Critically, the Complaint states that "Lindberg . . . first became aware of the [Employment Agreement] on Friday, January 23, 2015[,]" *after* Lindberg's acquisition of Medflow. (Second Am. Compl. ¶ 356.) Taking the allegations of the Complaint as true, any conspiracy between Lindberg, Entity Defendants, and Riggi could not have been formed before 23 January 2015 because Lindberg was ignorant of the Employment Agreement prior to that date. The Complaint itself contains no allegations that Riggi had any role in subsequent actions to breach the Employment Agreement. Instead, the Complaint states that "Lindberg, along with the other [D]efendants and Nonparty Affiliates as directed by him" devised a plan in breach of the Employment Agreement." (Second Am. Compl. ¶ 359.) The Complaint fails to adequately allege that "outsiders," including Riggi, were co-conspirators to breach the Employment Agreement. Therefore, application of the intracorporate immunity doctrine is not doomed on that basis.

71. Plaintiff next argues that under North Carolina law, intracorporate immunity does not extend to commonly-owned affiliates. In North Carolina, the intracorporate immunity doctrine has been applied to officers, directors, and wholly owned subsidiaries. Other jurisdictions have further extended the doctrine to commonly-owned affiliates. *See Dunlap v. Cottman Transmissions Sys., LLC*, 576 Fed. Appx. 225, 227 (4th Cir. 2014) ("The intracorporate immunity doctrine originates in antitrust laws and holds that a corporation cannot, with certain exceptions,

conspire with its officers, wholly-owned subsidiaries, *and commonly-owned affiliates*.") (emphasis added). In the absence of guiding law in North Carolina, the Court chooses to follow the Fourth Circuit's reasoning that intracorporate immunity applies to commonly-owned affiliates. *Id.*

72. Third, Plaintiff argues that the independent personal stake exception to intercorporate immunity applies. "[A]n exception to the [intracorporate immunity] doctrine exists if the corporate agent has an 'independent personal stake in achieving the corporation's illegal objective.' " *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC,* 184 N.C. App. 613, 625 (2007) (citing *Buschi v. Kirven*, 775 F.2d 1240, 1252 (4th Cir. 1985). Plaintiff argues that Defendants had a personal stake in breaching the Employment Agreement because "Defendants are . . . personally liable under the [North Carolina Wage and Hour Act] for payment of [Plaintiff's] wages, Change of Control Payments, and Severance." (Pl.'s Resp. 24.)

73. This Court has previously observed that "[t]his 'independent personal stake' exception must not be interpreted in too broad a manner[.]" *Garlock v. Hilliard*, 2000 NCBC LEXIS 6, **17 (N.C. Super. Ct. Aug 22, 2000) (quoting *Selman v. Am. Sports Underwriters, Inc.*, 697 F. Supp. 225, 238—39 (E.D. Va. 1988). An independent personal stake must be "wholly separable from the more general and indirect corporate benefit always present under the circumstances surrounding virtually any alleged corporate conspiracy." *Id.*

74. Personal liability under the North Carolina Wage and Hour Act is not "wholly separable" from the corporate benefit Defendants obtained. The benefit to

Defendants both personally and corporately was the avoidance of wages, Severance, and Change of Control payments owed to Plaintiff under the Employment Agreement. Because the independent personal stake exception is inapposite to this case, the Court concludes that the intracorporate immunity doctrine applies to Defendants.

75. The Court therefore grants the Motion to the extent it seeks dismissal of Plaintiff's claim for civil conspiracy.

### C. Successor Liability

76. Plaintiff alleges that Medflow Holdings is the successor in interest to Medflow because (1) Medflow Holdings, by accepting Medflow's assets as part of a scheme to defraud Plaintiff, also assumed all of Medflow's liabilities; and (2) the transfer of Medflow's assets to Medflow Holdings was a *de facto* consolidation or merger of the two companies. (Second Am. Compl. ¶¶ 674–677.) Although the Motion requests dismissal of the Complaint in its entirety, Defendants concede that Medflow Holdings is "Medflow['s] . . . successor," and make no argument relating to successor liability. (Br. Supp. 2.) Accordingly, the Court deems any argument by Defendants regarding successor liability to be waived.

77. The Court therefore denies the Motion to the extent it seeks dismissal of Plaintiff's claim of successor liability against Medflow Holdings.

**D.      Wage and Hour Act**

78.     Plaintiff alleges violations of the North Carolina Wage and Hour Act ("WHA") directly against all Defendants on the grounds that each Defendant is an "employer" under the WHA.  (Second Am. Compl. ¶¶ 609–19, 622.)

79.     Defendants argue for the dismissal of Plaintiff's claim under the WHA because (1) the Employment Agreement is unenforceable, (2) Plaintiff was placed on leave in February 2015 and "performed no work" for Medflow during that time, and (3) the non-Medflow Defendants are not "employers" of Plaintiff under the WHA.  (Br. Supp. 13–14, Reply Br. 2.)

80.     Because Judge Gale's 13 September 2016 Order dismissed the Motion "insofar as it attacks Plaintiff['s] claims for breach of contract[,]" the Court declines to reconsider the Employment Agreement's enforceability, the very same issue Judge Gale ruled upon, and addresses only Defendants' second and third arguments.  (*See* 13 Sept. 2016 Or. 1.)

81.     Pursuant to the WHA, an "employer shall pay every employee all wages and tips accruing to the employee[.]"  N.C.G.S. § 95-25.6.  "For the purposes of [the WHA,] 'wage' includes sick pay, vacation pay, severance pay, commissions, bonuses, and other amounts promised when the employer has a policy or a practice of making such payments."  *Id.* § 95-25.2(16).

82.     The Complaint alleges that Plaintiff's Employment Agreement with Medflow provided that, in exchange for Plaintiff's employment as CEO, Medflow would pay him an Annual Base Salary and, under certain circumstances, Change of

Control Payments and Severance. (Second Am. Compl. ¶¶ 164, 336, 420–31; Exs. 6–8.) Upon Lindberg's acquisition of Medflow, the change of control and severance payments allegedly became due, Medflow did not make such payments, and Lindberg put Plaintiff on "paid vacation" beginning on 10 February 2015. (Second Am. Compl. ¶¶ 407–410, 609–22.) Accordingly, the Complaint alleges facts sufficient to show that Plaintiff was owed wages, Change of Control payment, and Severance under the Employment Agreement.

83. The remaining issue is whether the non-Medflow Defendants are "employers" of Plaintiff. The WHA defines an "employer" broadly to include "any person [or commercial entity] acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 95-25.2(5); s*ee Powell v. P2Enterprises, LLC*, 247 N.C. App. 731, 734 (2016) (noting that "the term 'person' includes individuals as well as commercial entities[.]"). Courts liberally construe the term "employer" and employ the "economic reality" test, which considers factors including whether the person had the power to hire and fire, whether the person supervised and controlled employee schedules, whether the person determined the rate and method of payment, and whether the person maintained employment records. *Powell,* 247 N.C. App. at 735. Although Plaintiff's only direct employer was Medflow, the Complaint contains allegations that all Defendants, under Lindberg's shared control, indirectly controlled Plaintiff's working conditions, account and payroll functions, and responsibility for disbursement of funds. (Second Am. Compl. ¶¶ 482–85, 611.)

84. Plaintiff's allegation that his salary, Change of Control payments, and Severance constitute wages as defined under the WHA, along with his allegation that Defendants wrongfully failed to make such payments and placed Plaintiff on "paid vacation," is sufficient to state a claim for relief against all Defendants under § 95-25.2(16).

85. Therefore, the Motion is denied to the extent it seeks dismissal of Plaintiff's claims under the WHA.

### E.   Retaliatory Employment Discrimination

86. Plaintiff alleges violations of the North Carolina Retaliatory Employment Discrimination Act, N.C.G.S. § 95-240 ("REDA") against all Defendants on the grounds that Defendants are "persons" as defined in REDA. (Second Am. Compl. ¶¶ 623–37.)

87. REDA prohibits "any retaliatory action against an employee because the employee in good faith does or threatens to . . . [f]ile a claim or complaint" with respect to the various statutory employment rights. REDA's purpose is "to prevent employer retaliation from having a chilling effect upon an employee's exercise of" their statutory rights. *Whitings v. Wolfson Casing Corp.*, 173 N.C. App. 218, 222 (2005).

88. Defendants argue that Plaintiff was terminated for "patent self-dealing in violation of [his] fiduciary duties, not because [he] sought to exercise any legitimate right." (Br. Supp. 14.) Plaintiff, conversely, contends he was terminated because he exercised his legally protected rights by filing a wage complaint with the U.S.

Department of Labor following Defendants' refusal to pay the sums owed under the Employment Agreement.

89. In order to state a claim under REDA, a plaintiff must show that he (1) "exercised his rights" as listed under N.C.G.S. § 95-241(a); (2) "suffered an adverse employment action;" and (3) the "adverse employment action" was a "retaliatory action . . . taken because" the employee exercised his statutory rights. *Wiley v. UPS, Inc.*, 164 N.C. App. 183, 186 (2004). REDA "does not prohibit all discharges of employees . . . it prohibits only those discharges made because the employee exercises his compensation rights." *Morgan v. Musselwhite*, 101 N.C. App. 390, 393 (1991).

90. The exercise of one's rights under the Wage and Hour Act is a legally protected activity under REDA. *See* § 95-241(a)(1)(b). Here, the Complaint alleges that, prior to filing this action, Plaintiff filed complaints with the Wage and Hour Bureau of the North Carolina Department of Labor and was issued right-to-sue letters therefrom. (Second Am. Compl. ¶¶ 616, 628–35.) The right-to-sue letters granted Plaintiff a right to pursue REDA claims against Medflow, Lindberg, Eli Global, and Eli Research, but no other Defendants. (Compl. Ex. 48, ECF No. 118.24.) The Complaint also alleges that Defendants fired Plaintiff in retaliation for Plaintiff's attempt to exercise his compensation rights under the Employment Agreement. (Second Am. Compl. ¶¶ 629–31.) Thus, the Complaint satisfies the pleading requirements for a claim under REDA.

91. Defendants assert "[Plaintiff was] terminated not for asserting rights . . . but because [he] disregarded [his] fiduciary obligations and engaged in furtive, self-

dealing conduct that harmed Medflow." (Br. Supp. 15.) This dispute about the reasons for termination, however, is factual, and factual allegations in the Complaint are to be "treated as true[.]" *See Fischer Inv. Capital, Inc.*, 200 N.C. App. at 649. And as explained in paragraph 64, *supra*, the Court declines to consider argument regarding the Employment Agreement's validity as such was ruled upon in the 13 September 2016 Order.

92. Taking Plaintiff's allegations as true, the Complaint sufficiently alleges that Plaintiff engaged in statutorily protected activity and was terminated therefor. However, because Plaintiff failed to obtain right-to-sue letters as to Eli Equity, SNA, Southland National Holdings, Inc., SNIC, DJRTC, and Medflow Holdings, Plaintiff's REDA claims against such defendants cannot proceed. Accordingly, the Court grants the Motion as to the REDA claims against Eli Equity, SNA, Southland National Holdings, Inc., SNIC, DJRTC, and Medflow Holdings. Except as herein granted, the Motion is denied.

**F. "Tortious Retaliation"**

93. Plaintiff alleges "tortious retaliation" against all Defendants on the grounds that Plaintiff's attempt to receive the payments owed him under the Employment Agreement was "a substantial factor in [Defendants'] acting . . . to take the retaliatory actions described herein." (Second Am. Compl. ¶¶ 643.) Defendants assert that Plaintiff's claim for "tortious retaliation" should be dismissed because North Carolina law recognizes no such claim. (Br. Supp. 15–16.) North Carolina does not recognize an independent cause of action for "tortious retaliation," but does

recognize a claim for wrongful discharge. *Ridenhour v. Inter'l Bus. Mach. Corp.*, 132 N.C. App. 563, 568–69 (1999). Wrongful discharge applies when an employee is fired "(1) for refusing to violate the law at the employer[']s request, (2) for engaging in a legally protected activity, or (3) based on some activity by the employer contrary to law or public policy." *Considine v. Compass Grp. USA, Inc.*, 145 N.C. App. 314, 321–22 (2001). In North Carolina, however, "[t]he tort of wrongful discharge arises only in the context of employment at will." *Claggett v. Wake Forest Univ.*, 126 N.C. App. 602, 611 (1997). Employment is "at will" unless the relationship is governed by a contract "establishing a definite term of employment." *Kurtzman v. Applied Analytical Indus.*, 347 N.C. 329, 331 (1997). Breach of contract, not wrongful termination, "is the proper claim for a wrongfully discharged employee who is employed for a definite term." *Wagoner v. Elkin City Sch. Bd. of Educ.*, 113 N.C. App. 579, 588 (1994).

94.     The Complaint alleges Plaintiff was discharged after trying to exercise his compensation rights under the Employment Agreement and was therefore subject to "tortious retaliation." (Second Am. Compl. ¶¶ 641–44.)

95.     Though not properly labeled, the Complaint attempts to allege a claim for wrongful discharge, so the claim should not be dismissed on the basis asserted by Defendants. *See Considine*, 145 N.C. App. at 321–22; *Gant*, 94 N.C. App. at 199. However, the Complaint reveals that Plaintiff was not an employee at will; rather, Plaintiff was a contract employee under the Employment Agreement. (Second Am. Compl. ¶ 144, Exs. 6–8.) Thus, wrongful discharge "is [not] the proper claim"; breach

of contract is instead. *See Wagoner*, 113 N.C. App. at 588. And Plaintiff has pled breach of contract.

96. Accordingly, the Motion is granted as relates to the claim of wrongful discharge.

**G. Uniform Voidable Transactions Act**

97. Plaintiff alleges violations of the Uniform Voidable Transactions Act ("UVTA") against all Defendants. (Second Am. Compl. ¶¶ 645–656.)

98. The UVTA, formerly the Uniform Fraudulent Transfer Act, allows a creditor to bring a civil action against a debtor for certain transfers made by the debtor. N.C.G.S. § 39-23.7; *see also McKee v. James*, 2013 NCBC LEXIS 33, at *39 (N.C. Super. Ct. July 24, 2013). Under the UVTA, a creditor is a person who has a "right to payment[.]" N.C.G.S. § 39-23.1(3)–(4). Thus, "[a] plaintiff must have standing as a creditor to proceed with a claim under the UVTA." *Transatlantic Healthcare, LLC v. Alpha Constr. of the Triad, Inc.*, 2017 NCBC LEXIS 21, at *21 (N.C. Super. Ct. Mar. 9, 2017).

99. Defendants assert that the Complaint contains (i) "wholly conclusory" allegations regarding the transfer of Medflow assets and (ii) Plaintiff has no "right to payment" because the Employment Agreement is unenforceable.

100. Here, the Complaint alleges that Plaintiff's Employment Agreement established a right to payment of an annual base salary, Severance Benefits, and the Change of Control Payment. (Second Am. Compl. ¶¶ 149, 164–66.) The Complaint further alleges specific facts regarding the transfer of Medflow's assets to other

Lindberg entities, including other Defendants, to "hinder, delay, or defraud" Plaintiff, (Second Am. Compl. ¶¶ 490–530, 646.), with the ultimate goal of "mak[ing] any claim, judgment or lien in favor of [Plaintiff] against Medflow uncollectible." The Complaint alleges specific facts regarding cash transfers from Medflow to Medflow Holdings made without adequate compensation (Second Am. Compl. ¶ 504). Thus, the Complaint alleges the necessary elements for fraudulent transfer because the Complaint alleges (i) Plaintiff had a "right to payment" from Medflow under the Employment Agreement and (ii) Defendants transferred Medflow assets with "intent to hinder, delay, or defraud" Plaintiff. *See* N.C.G.S. § 39-23.4(a).

101. Therefore, the Court denies the Motion regarding the UVTA claim.

**H.  Fraud**

102. Plaintiff brings a claim of fraud against Medflow for representations made to Plaintiff prior to Lindberg's acquisition of Medflow and following Plaintiff's request for payment under the Employment Agreement. To plead a claim of fraud, Plaintiff must allege "(1) a false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, and which (5) results in damage to the injured party." *Town of Belhaven v. Pantego Creek, LLC*, 250 N.C. App. 459, 469 (2016) (citation omitted).

103. Rule 9(b) requires that a claim for fraud be pled with particularity. N.C.G.S. § 1A-1, Rule 9(b). "[I]n pleading actual fraud[,] the particularity requirement is met by alleging time, place and content of the fraudulent representation, identity of the person making the representation and what was

obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85 (1981). A plaintiff must also plead facts to support his allegation that the representation was false or untrue. *Harrold v. Dowd*, 149 N.C. App. 777, 783 (2002). "Mere generalities and conclusory allegations of fraud will not suffice." *Id.*

104. The Complaint cites representations made by Lindberg to Plaintiff on two separate dates as the basis for its fraud claim. The first representations were made on 18 September 2014 when Lindberg assured Plaintiff that Lindberg would, following acquisition of Medflow: (i) leave Plaintiff in place as CEO, (ii) offer Plaintiff an employment contract, and (iii) give Plaintiff independence in operating Medflow. (Second Am. Compl. ¶ 658.) The second representation was made by Lindberg on 30 January 2015 when Lindberg told Plaintiff that "we will review" Plaintiff's request for Change of Control Payments. (Second Am. Compl. ¶ 29.)

105. Defendants assert that the 18 September 2014 representations were "true when made" because Lindberg was not aware of the Employment Agreement's terms until 23 January 2015. (Br. Supp. 18–19.) The Court agrees, and thus the 18 September 2014 representations cannot serve as the basis of a *prima facie* fraud claim.

106. Not so with Lindberg's representation that he "would review" the request for Change of Control Payments. The Complaint alleges that on 27 January 2015, three days prior to telling Plaintiff he would review the Change of Control payment request, Lindberg was already preparing to create a new entity to "strip out assets, people (the ones we want to) and operations" from Medflow. (Second Am. Compl. ¶

361.) That Lindberg had allegedly already taken steps to drain Medflow of assets while telling Plaintiff his request would be reviewed supports an inference that Lindberg's representation was false, reasonably calculated to deceive, and intended to deceive Plaintiff. The Complaint also alleges that Plaintiff's failure to perfect his security interest in the Encumbered Assets was the "result of the . . . representation[]." *See Harrold*, 149 N.C. App. at 782; *see also Ragsdale*, 286 N.C. at 139.

107. The Court concludes that Plaintiff has adequately alleged a claim of fraud. Accordingly, the Motion is denied to the extent it seeks dismissal of the fraud claim.

## I.     Unfair and Deceptive Trade Practices

108. Plaintiff alleges violations of the Unfair and Deceptive Trade Practices Act, N.C.G.S. §§ 75-1.1, et. Seq. ("UDTPA") against all Defendants. To state a claim for violation of the UDTPA, a plaintiff must show that: (1) the defendant committed an unfair or deceptive act; (2) the act affected commerce; and (3) the act proximately caused injury to the plaintiff. N.C.G.S. § 75- 1.1 (2021); *Gress v. Rowboat*, 190 N.C. App. 773, 776 (2008). The proper inquiry "is not whether a contractual relationship existed between the parties, but rather whether the defendants' allegedly deceptive acts affected commerce." *Prince v. Wright*, 141 N.C. App. 262, 268 (2000). Determining whether a trade practice is unfair or deceptive depends upon the facts of each case and the impact the practice has on the market. *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 307–08 (1963).

109. Defendants argue for dismissal of the UDTPA claim because Plaintiff seeks remedies solely relating to his employment relationship with Medflow and thus any unfair or deceptive acts did not "affect commerce." (Reply Br. 8.)

110. "As a general rule, there is a presumption against unfair and deceptive practice claims as between employers and employees." *Gress*, 190 N.C. App. at 776. The general rule may not apply, however, where "the claimant [makes] a showing of business-related conduct that is unlawful or of deceptive acts that affect commerce beyond the employment relationship." *Id.* at 776–77.

111. Here, while Plaintiff seeks remedies pursuant to an employment relationship with Medflow, the claims alleged include a scheme of fraudulent transfer between multiple companies, including Medflow, Medflow Holdings, and SNIC. The fact that such companies were each indirectly owned by Lindberg is no barrier. *See Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 57 (2011) (Finding a defendant's actions were " 'in or affecting commerce' and constituted unfair or deceptive acts or practices[,]" because "multiple companies [were] involved[,]" where the companies shared a majority owner.). The facts alleged with respect to Plaintiff's UVTA claim creates the foundation that satisfies the requirements under the UDTPA.

112. Accordingly, the Court denies the Motion to the extent it seeks dismissal of Plaintiff's claim under the UDTPA.

**J.     Constructive Trust**

113.  Plaintiff brings a claim of constructive trust.  (Second Am. Compl. ¶¶ 689–692.)  However, a constructive trust is not a standalone claim for relief or cause of action.  *See Weatherford v. Keenan*, 128 N.C. App. 178, 179 (1997).  Accordingly, for purposes of clarity, the Court grants Defendants' motion to dismiss to the extent it seeks dismissal of the purported cause of action for a constructive trust.  The Court renders this decision without prejudice to Plaintiff's ability to pursue the equitable remedy of a constructive trust to the extent one or more other claims for relief may justify such a remedy.  *See Roper v. Edwards*, 323 N.C. 461, 464 (1988) (describing constructive trust as an equitable remedy "to prevent the unjust enrichment of the holder of . . . an interest in[] property which such holder acquired through fraud").

**K.     Replevin and Conversion**

114.  Finally, the Complaint alleges that Medflow converted and must return Ehmann's personal cell phone number.  (Second Am. Compl. ¶ 694.)  Defendants argue that Ehmann cannot demonstrate ownership of the phone number because the Complaint states that Ehmann allowed the phone number to become affiliated with Medflow, and that Medflow has since paid for use of the phone number.  (Br. Supp. 23.)  However, subsequent to the filing of the Motion and the briefing of this matter, Ehmann voluntarily dismissed all of his claims against Defendants in this case.  As a result, the Court deems the claims of replevin and conversion to no longer be before

it, and the Motion is denied as moot to the extent it seeks dismissal of the replevin and conversion claims.

## VI.  CONCLUSION

115.  For the foregoing reasons, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the Motion as follows:

A.  The Motion is DENIED as to the claim for piercing the corporate veil;

B.  The Motion is GRANTED as to the claim for civil conspiracy;

C.  The Motion is DENIED as to the claim for successor liability;

D.  The Motion is DENIED as to the claim for violation of the WHA;

E.  The Motion is GRANTED in part and DENIED in part as to the claim for violation of REDA;

F.  The Motion is GRANTED as to the claim for "tortious retaliation;"

G.  The Motion is DENIED as to the claim for violation of the UVTA;

H.  The Motion is DENIED as to the claim for fraud;

I.  The Motion is DENIED as to the claim for violation of the UTDPA;

J.  The Motion is GRANTED as to the claim for constructive trust;

K.  The Motion is DENIED AS MOOT to the claim for replevin and conversion.

**SO ORDERED**, this the 12th day of September, 2022.

/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
for Complex Business Cases